In re M.M., D.L., Minor Children.
No. COA06-1053
Court of Appeals of North Carolina.
Filed February 6, 2007
This case not for publication
Janet K. Ledbetter for respondent-appellant mother.
Mercedes O. Chut for respondent-appellant father.
Harnett County Department of Social Services, by E. Marshall Woodall and Duncan B. McCormick.
Elizabeth Boone for Guardian ad litem.
LEVINSON, Judge.
Respondent-parents (mother and father) appeal from an order adjudicating their minor children abused and neglected. Petitions were filed by Harnett County Department of Social Services on 12 September 2005 (DSS) alleging, in identical petitions for M.M. and D.L., that the juveniles were (1) abused, on the grounds that mother (i) did nothing to protect the juveniles when they alleged an older male sibling made sexual gestures toward them, (ii) punished them for telling father about the sibling's advances, and (iii) forced the juvenile to allege father molested her and hit her with a belt and choked her until the child made this allegation; (2) neglected, on the grounds that the child "live[d] in an environment injurious to the juveniles' welfare" because (i)domestic violence was ongoing in the home, (ii) mother hit them with a belt "all over her body" and strikes them when she is "angry or under the influence of alcohol", and (iii) has been diagnosed as bipolar but is not taking medications; and (3) dependent.
The parents lived together and separately at various times in North Carolina beginning in 2004. At the time the juveniles were removed from the home on 12 September 2005, the parents resided in separate homes.
Sara Messer, a social worker with DSS, became involved with the family in September 2005 as a result of a report made to the Department. The report to DSS, according to Messer, originated from mother, who informed the on-call social worker that father "had been molesting" M.M., the older juvenile. Father denied molesting the juveniles, and asserted that one of the older male siblings touched M.M. The juveniles denied being touched inappropriately by father. The mother "made [the juveniles] feel uncomfortable" and "punish[ed]" the juveniles when she learned of [the] allegation [that an older male sibling touched one or both of them]. Father informed Messer that, on 9 September 2005, M.M. "ran down to his home" and told him that mother was "beating up" on one of the other children. Mother later told Messer that she "did not remember if she had actually touched the children . . . and didn't remember what had happened because she was under the influence." Messer summarized more of the family's history. During the fall of 2005, there was ongoing weekly contacts between the family and DSS. Father once alleged that mother had attempted to choke and hit one of the juveniles. There were additional reports made to DSS concerning the children. One report in August 2003 was not substantiated; in May 2004, DSS substantiated a report "on both parents" for "environment injurious, domestic violence, where one of the children was hurt  or hit during the domestic violence." Messer stated there were numerous domestic violence protective orders that had been "violated or dropped." Finally, DSS substantiated a report wherein "the kids had been threatened by mom to lie to the police and say that [father] was the aggressor."
Gail McLean, a case management social worker with DSS, testified. She had been involved with the family since May 2004 when mother arrived in North Carolina from Colorado with the children. McLean addressed "issues of domestic violence, mother's failure to take medication for bipolar condition, and discipline." As part of the case services plan, the parents were to refrain from domestic violence, and mother was to attend parenting classes, take medication, and participate in counseling for her bipolar condition. Only mother was required, as part of the initial plan, to get a mental health assessment and participate in domestic violence classes. An April 2004 report to DSS alleged domestic violence in the home because mother would not take her medicines was substantiated. There were several additional reports of domestic violence, including one when mother accused father in April 2005 of causing a black eye. Another report alleged that father slapped mother. During one or more of these domestic violence incidents, at least one of the juveniles was present and sought the help of neighbors.
McLean's testimony continued. The children had been removed from their home twice while living in Colorado  once in 1996, and again in 1998. The children were placed into foster care following their removal in 1996, returned to mother in December 1997, and placed in foster care again between February 1998 and August 2000. A TPR was filed in Colorado but later dropped when mother "had made some advances and remained clean of drugs and alcohol, and [father] had moved here to North Carolina." Father was asked in January 2005 as part of case management to have a mental health evaluation and to complete recommendations. He completed an evaluation through the Veterans Administration.
Father testified that he moved to North Carolina in 2000. He had experienced three gunshot wounds; a broken neck; a coma; grenade injuries; and broken ribs. He was totally disabled and drew social security and military disability. When he moved to North Carolina, the children were still in foster care in Colorado. Mother and the children moved to North Carolina in 2003 or 2004. DSS worker McLean had not asked him "to do anything" because all of the directives concerned mother. Father also stated that "every domestic violence charge was dropped" and that he had "never" been convicted of anything. He had only recently moved into the same neighborhood where mother lived with the children before the events of 9 September 2005. He moved close to mother's residence because he wanted to be a parent to the juveniles. On the evening of 9September 2005, M.M. ran to his house, crying, and stated that mother was "hitting us." He walked to mother's house with M.M. Mother had not been on medication, and was "inappropriately hounding the girls about being touched, and she was  I guess she was beating them." Father further testified that "[s]he slapped me, and that's when the girls ran next door to go call the police."
Father further testified that the domestic violence ordinarily occurred on a payday, and when mother was drinking alcohol and not taking her medication. "And it was usually  and it was always in the defense of the children. Always." Father also testified that mother "is bipolar and schizophrenic[,]" and that he has a drivers license but does not own a vehicle. Mother drives him to places on occasion  including the courthouse on the day of the adjudication hearing. Notwithstanding his concerns about mother's parenting deficiencies, domestic violence, and mental health challenges, father has not ever filed a custody action.
After a series of continuances, the petitions came on for hearing 22 May 2006. An adjudication and disposition order was entered 9 June 2006. In this order, the trial court made the following findings of fact:
4. [Father] is alleged to be the biological father of juvenile D.L. (and in all events he is the stepfather of juvenile D.L.) and is the stepfather of M.M.
. . .
8. At the time of the filing of the petitions herein, North Carolina is the home state of these juveniles. No other state currently is exercising jurisdiction as to custody of the juveniles. There had been DSS involvement with this family in Colorado where they once lived. The children had been removed from the parents on two occasions by the authorities in Colorado (the first time in October 1996 and later in 1998). There are no reports of outstanding orders from any court in that state.
9. In April 2004, the mother and the juveniles moved to North Carolina to join the father who was already in North Carolina. . . .
10. [DSS] has investigated CPS reports on the family and after investigation extended case management services and made certain referrals. Service plans were entered with the parents who both failed to consistently comply with the terms thereof.
11. The parents have engaged in acts of domestic violence in the presence of the children and with the children becoming involved at times in the altercations between the parents, thereby resulting in a risk of physical and emotional harm to the juveniles. The parents have each disobeyed the provisions of domestic violence orders.
12. The mother abuses alcoholic beverages and other impairing substances and during the time of being under the influence of such substances, she has inappropriately supervised and disciplined the juveniles. She made accusations of sexual misconduct by the father against the juveniles (which the father denied), she beat one or both juveniles to make her or them admit sexual wrongdoings by the father, she improperly punished the juveniles by choking them and she generally disregarded proper parental duties and responsibilities toward the juveniles.
13. The father was aware of the circumstances and the actions of improper parental care of the juveniles by the mother; however, he took no actions to protect them.
14. Although the mother has accused the father with inappropriate sexual conduct relating to the juvenile, she has taken no action to protect them.
15. The mother has punished the juveniles for revealing that the oldest brother in the family had made improper sexual advances toward them. The mother failed to take steps to properly deal with the allegations.
16. On February 21, 2006, [father] filed for a restraining order against [mother], which is effective until June 21, 2006. The parents have continued to have contact and continued incidents of domestic violence.
Upon these findings, the trial court concluded the juveniles were abused juveniles, pursuant to N.C. Gen. Stat. § 7B-101(1)(2005), in that "the parents have created or allowed to be created a substantial risk of injury to the juveniles by other than accidental means and have created or allowed to be created a risk of serious emotional damage to the juveniles." In addition, the trial court concluded the juveniles were neglected juveniles, under N.C. Gen. Stat. § 7B-101(15)(2005), in that they "did not receive proper care and supervision from their parent or parents and the juveniles have been allowed to live in an environment injurious to their welfare."
The court moved immediately to disposition, in accordance with N.C. Gen. Stat. § 7B-901 (2005), and made findings that, inter alia, the DSS service plans were "appropriate" and needed in the event the parents "are able to correct their parental behavior for a return of the juveniles to their care"; the parents had not complied with the service plans and had made "no real progress toward reunification for eight months"; the juveniles had been removed from their parents' home three times; and that a "continuation of efforts to reunite them with their parents would be futile." Moreover, the court found that the parents had not maintained visitation on a consistent basis; that conflicts had developed between father and M.M., who did not wish to visit with him; that the "risk to the juveniles if returned to the parents would be intensive"; that a return of custody to the parents would be "contrary to the welfare of the juveniles"; that DSS had provided a variety of services to the family; and that DSS should be relieved of further efforts to reunite the juveniles with the parents. After making numerous conclusions of law concerning best interests, reasonable efforts and jurisdiction, the trial court decreed that DSS would have custody of the juveniles with placement authority; that visitation could be allowed if deemed "appropriate" by DSS, and that DSS was released from any further obligation to reunite the juveniles with the parents.
On appeal, mother contends that findings of fact 10-17 of the adjudication order are not supported by the evidence. Mother's central argument is that the "clear and convincing" standard required in juvenile adjudications is not met here because (1) none of the DSS social workers had personal knowledge of any of the incidents inside the household, and (2) father's testimony adds little or no support for the findings of fact. Father challenges portions of findings 8 and 16, and 11, 13 and 17 in their entirety. Father's challenge to the findings of fact does not rely on whether DSS witnesses had firsthand knowledge of the events, but on whether the evidence, taken in its entirety, supports the findings. "Where the trial court sits without a jury and hears the evidence in an abuse and neglect adjudication, the facts found by the trial court are binding on an appellate court if supported by clear and convincing competent evidence." In re McLean, 135 N.C. App. 387, 394, 521 S.E.2d 121, 125 (1999). The trial court's conclusions of law are reviewed de novo by this Court. In re J.D.C., ___ N.C. App. ___, ___, 620 S.E.2d 49, 51 (2005). Where statements by out-of-court declarants are admitted without objection or requests that the same be considered for limited purposes, the statements can be considered as substantive evidence. See, e.g., State v. Dyson, 165 N.C. App. 648, 652, 599 S.E.2d 73, 76 (2004) ("[W]hen admitted without objection, otherwise inadmissible hearsay may be considered with all the other evidence and given such evidentiary value as it may possess."); State v. Featherson, 145 N.C. App. 134, 137, 548 S.E.2d 828, 831 (2001) (prior inconsistent statements admitted without objection properly considered substantive evidence); State v. Laws, 16 N.C. App. 169, 170, 191 S.E.2d 401, 402 (1972).
Neither mother nor father assigned as error the admissibility or use of evidence by the trial court. See N.C.R. App. P. 10 (c)(1) ("Each assignment of error shall . . . be confined to a single issue of law; and shall state plainly, concisely and without argumentation the legal basis upon which error is assigned."). During the hearing, counsel made numerous general objections to the admission of testimony by DSS employees. These objections were overruled, and at no time during the hearing did counsel ask the trial court to consider testimony for purposes other than for the truth of the matter asserted. As a consequence, consistent with Dyson, we have evaluated whether the proffered evidence, properly received for "such evidentiary value as it may possess[,]" supports the challenged findings of fact. We conclude that the testimony cited above does support the challenged findings of fact. The relevant assignments of error are therefore overruled.
Mother and father next challenge the trial court's conclusions of law that M.M. and D.L. are abused and neglected juveniles. Here, the trial court concluded that the juveniles were neglected because they "did not receive proper care and supervision from their parent or parents and juveniles have been allowed to live in an environment injurious to their welfare." The trial court also concluded that the juveniles were abused in that "the parents have created or allowed to be created a substantial risk of serious injury to the juveniles by other than accidental means and have created or allowed to be created a risk of serious emotional damage to the juveniles."
A neglected juvenile is defined by N.C. Gen. Stat. § 7B-101(15)(2005):
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. An abused juvenile is defined by N.C. Gen. Stat. §§ 7B-101(1)(b),(e) (2005) as one whose parent or caretaker "creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means", or who "creates or allows to be created serious emotional damage to the juvenile. . . ."
Here, the findings reveal ongoing domestic violence and improper discipline. There has been a risk of physical injury to the children, and one or both of the juveniles had been physically struck on one or more occasions. Moreover, the parents did not take appropriate actions in response to reports of inappropriate sexual advances. We conclude that the findings support the conclusions of law that M.M. and D.L. were abused and neglected juveniles. The relevant assignments of error are overruled.
Respondents' remaining arguments are addressed to the disposition order. The parents primarily challenge the trial court's decision to cease reunification efforts. Mother argues, citing In re Weiler, 158 N.C. App. 473, 581 S.E.2d 134 (2003), andIn re Everett, 161 N.C. App. 475, 588 S.E.2d 579 (2003), that the trial court did not make specific findings supporting the statutory conditions for the discontinuation of reunification efforts. Mother also argues that the disposition order should be reversed insofar as it changes the permanent plan to adoption. Finally, the respondents urge this Court to reverse the disposition order insofar as it ceases reunification on grounds already considered and rejected in this opinion above. N.C. Gen. Stat. § 7B-507(b)(1)(2005) provides:
(b) In any order placing a juvenile in the custody or placement responsibility of a county department of social services, whether an order for continued nonsecure custody, a dispositional order, or a review order, the court may direct that reasonable efforts to eliminate the need for placement of the juvenile shall not be required or shall cease if the court makes written findings of fact that:
(1) Such efforts clearly would be futile or would be inconsistent with the juvenile's health, safety and need for a safe, permanent home within a reasonable period of time[.]
The findings and conclusions in the present disposition order are remarkably different than the ones presented in Weiler and Everett. The findings contained in this adjudication and disposition order support the trial court's determination, pursuant to G.S. § 7B-507(b)(1), that reunification efforts should cease. Moreover, we reject mother's contention that the trial court erroneously changed the permanent plan to adoption. The order on appeal did not decree that termination of parental rights and adoption be the permanent plan; instead, in compliance with the requirements of N.C. Gen. Stat. § 7B-507(c) (2005), it directed that a permanency planning be held within thirty (30) days thereafter. The relevant assignments of error are overruled.
We have evaluated the respondents' remaining arguments and conclude that they should be overruled.
Affirmed.
Chief Judge MARTIN and Judge McCullough concur.
Report per Rule 30(e).